UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA,

    -against-

RAJ RAJARATNAM and DANIELLE CHIESI,

    Defendants.

09 Cr. 1184

**MEMORANDUM OPINION AND ORDER**

Richard J. Holwell, U.S. District Judge:

    Now before the Court is the government's "Motion for a Procedure to Address the Public's Right to Access Wiretap Applications and Orders." The motion proposes a procedure for the parties to follow when (1) submitting a wiretap application or wiretap order or (2) otherwise disclosing Title III material in a motion or brief to the Court.[1] Under the proposed procedure, (i) the party wishing to submit such material would file it under seal (including both a redacted version and an unredacted version that highlights the proposed redactions) and deliver a copy to the other parties; (ii) any party opposing a proposed redaction would submit objections within a week, with responses due three business days later; and (iii) the Court would decide which redactions should be made and then direct public filing of the documents. The defendants oppose the government's motion. For the reasons given below, the motion is denied.

---

[1] Although the government's brief is not entirely clear on this point, the Court assumes that its motion proposes a procedure only for Title III material—including wiretap applications, orders, and intercepts—that is contained in parties' motions or briefs to the Court. The Court's holding addresses only Title III material contained in such submissions.

I

In *Richmond Newspapers, Inc. v. Virginia*, 448 U.S. 555 (1980), the Supreme Court "firmly established for the first time that the press and general public have a constitutional right of access to criminal trials." *Globe Newspaper Co. v. Superior Court*, 457 U.S. 596, 603 (1982) (describing the import of *Richmond Newspapers*). In reaching that decision, the seven-member majority relied upon the long history in this country of public criminal trials. *See Richmond Newspapers*, 448 U.S. at 576 (plurality opinion) ("[T]he First Amendment guarantees of speech and press, standing alone, prohibit government from summarily closing courtroom doors which had long been open to the public at the time that Amendment was adopted."); *id.* at 598 (Brennan, J., concurring in the judgment) (relying on "our ingrained tradition of public trials" to find that the First Amendment grants the public a First Amendment right of access to those trials).

But in *Richmond Newspapers* and more recent decisions, the Court also offered a functional rationale for the right of access. As Justice Stevens put it in his *Richmond Newspapers* concurrence, "the First Amendment protects the public and the press from abridgements of their rights of access to information about the operation of their government, including the Judicial Branch." *Id.* at 584 (Stevens, J., concurring); *see id.* at 597–98 (Brennan, J., concurring in the judgment) ("resolution of First Amendment public access claims in individual cases must be strongly influenced . . . by an assessment of the specific structural value of public access"); *id.* at 604 (Blackmun, J., concurring in the judgment) ("the public has an intense need and a deserved right to know about the administration of justice in general"); *cf. Globe Newspaper*, 457 U.S. at 604–05 ("to the

extent that the First Amendment embraces a right of access to criminal trials, it is to ensure that this constitutionally protected 'discussion of governmental affairs' is an informed one") (quoting *Mills v. Alabama*, 384 U.S. 214, 218 (1966)); *Press-Enterprise Co. v. Superior Court of California, Riverside County*, 464 U.S. 501, 518 (1984) ("*Press-Enterprise I*") (a First Amendment access claim may succeed where "access makes a positive contribution to th[e] process of self-governance," as in "improv[ing] public understanding of the *voir dire* process, thereby enabling critical examination of its workings to take place"). In subsequent cases the Supreme Court has used these twin rationales, which it has articulated as "experience" and "logic," to justify applying the First Amendment right of public access to certain other criminal proceedings. *See Press-Enterprise Co. v. Superior Court of California for the County of Riverside*, 478 U.S. 1, 9 (1986) ("*Press-Enterprise II*") ("If the particular proceeding in question passes these tests of experience and logic, a qualified First Amendment right of public access attaches."); *cf. In re Herald Co.*, 734 F.2d 93, 98 (2d Cir. 1984) (observing that "[i]t makes little sense to recognize a right of public access to criminal courts and then limit that right to the trial phase of a criminal proceeding, something that occurs in only a small fraction of criminal cases"). In *Press-Enterprise II*, for example, the Supreme Court extended the right of access to preliminary criminal hearings in California. *Press-Enterprise II*, 478 U.S. at 9.

      Reasoning from logic and experience, the Second Circuit has held that "the First Amendment extends some degree of public access to a pretrial suppression hearing." *In re Herald*, 734 F.2d at 99; *see id.* at 98 ("There is a significant benefit to be gained from

3

public observation of many aspects of a criminal proceeding, including pretrial suppression hearings that may have a decisive effect upon the outcome of a prosecution."); *cf. Waller v. Georgia*, 467 U.S. 39, 46–47 (1984) ("suppression hearings often are as important as the trial itself"). And in *In re New York Times Co.*, 828 F.2d 110 (2d Cir. 1987) ("*New York Times I*"), the Second Circuit extended a qualified right of access "to written documents submitted in connection with judicial proceedings that themselves implicate the right of access"—there, supporting papers for a motion to suppress Title III material. *See id.* at 114.[2] More recent decisions in this Circuit have reaffirmed the constitutional right to access such documents. *See In re New York Times Co.*, 834 F.2d 1152, 1154 (2d Cir. 1987) ("*New York Times II*"); *U.S. v. Gerena*, 869 F.2d 82, 85 (2d Cir. 1989); *cf. Hartford Courant Co. v. Pellegrino*, 380 F.3d 83, 93 (2d Cir. 2004) (First Amendment's "qualified right of access to judicial documents" is "a necessary corollary of the capacity to attend the relevant proceedings"); *Di Pietro v. United States*, No. 02 Cr. 1237-01, 2009 WL 801609, at *2 (S.D.N.Y. Mar. 24, 2009) ("The right of access to judicial documents stems from the right of access to criminal trials.").

Given this body of case law, the public plainly has a First Amendment right of access to the hearing on defendants' anticipated motion to suppress Title III material, and it plainly has a First Amendment right of access to the documents submitted to this Court in connection with that motion. For that reason, defendants' reliance on *In re New York Times Co.*, 577 F.3d 401 (2d Cir. 2009) ("*New York Times (2009)*"), in opposing the

---

[2] The documents at issue in *New York Times I* included the government's initial wiretap application, the order granting the application, and excerpts from wiretap intercepts.

4

government's motion is misplaced. There, the court decided only that no First Amendment right of access extends to wiretap applications themselves. *Id.* at 411. It reasoned that wiretap applications "have not historically been open to the press and general public," and that there is no First Amendment right of access to the underlying *ex parte* proceedings in which wiretap applications are presented to a district judge. *Id.* at 410. The opinion did not, however, call into doubt the Second Circuit's earlier holdings, in *New York Times I*, *New York Times II*, and *Gerena*, that a First Amendment right of access extends to pretrial motion papers containing Title III materials like wiretap applications and excerpts of wiretap intercepts. That fact is significant. In the case of wiretap applications submitted in connection with a suppression hearing, there "is a legitimate public interest in knowing the grounds on which government conduct in obtaining evidence is challenged." *New York Times I*, 828 F.2d at 114 (quoting *In re Herald Co.*, 734 F.2d at 101). But in *New York Times (2009)*, where a newspaper challenged the continued sealing of wiretap applications after all defendants had pleaded guilty, no such interest was at stake. Neither logic nor history suggests that the public has a constitutional right to access sealed wiretap applications where no pretrial motion or public proceeding is anticipated. Thus, the Second Circuit's recent decision in *New York Times (2009)* is wholly consistent with its holdings in *New York Times I* and *II* and *Gerena*. The Court finds that the First Amendment applies to the Title III material contained in the parties' pretrial suppression motion papers.

## II

But even where the First Amendment gives the public the right to access criminal proceedings and documents filed in connection with those proceedings, that right is qualified, "not absolute." *Press-Enterprise II*, 478 U.S. at 9. Courts must balance the right against other important values, like the Sixth Amendment right of the accused to a fair trial, *id.* at 14, and the defendant's and innocent third parties' privacy interests derived from Title III, *New York Times I*, 828 F.2d at 115–16. "Proceedings may be closed and, by analogy, documents may be sealed," *New York Times I*, 828 F.2d at 116, if a district court finds such action "essential to preserve higher values" and "narrowly tailored" to serve those values, *Press-Enterprise II*, 478 U.S. at 13–14.[3] Such values "include the defendant's right to a fair trial [and] privacy interests of the defendant, victims or other persons." *United States v. Doe*, 63 F.3d 121, 128 (2d Cir. 1995) (internal citations omitted).

In striking the proper balance between these competing concerns, courts should take into account the nature of the material at issue. This means judging the extent to

---

[3] The Second Circuit has instructed that, in deciding whether to close a proceeding or seal a document, a court must follow four steps: first, it must determine in "specific findings made on the record" whether "there is a substantial probability of prejudice to a compelling interest of the defendant, government, or third party which closure would prevent." *United States v. Doe*, 63 F.3d 121, 128 (2d Cir. 1995) (internal citations omitted). "Compelling interests may include the defendant' right to a fair trial [and] privacy interests of the defendant, victims or other persons." *Id.* (internal citation omitted). Second, if a substantial probability of prejudice does exist, the court must consider "whether 'reasonable alternatives to closure cannot adequately protect' the compelling interest that would be prejudiced by public access." *Id.* (quoting *Press-Enterprise II*, 478 U.S. at 14). Third, if reasonable alternatives are wanting, the court must decide whether, "under the circumstances of the case, the prejudice to the compelling interest 'override [s] the qualified First Amendment right of access.'" *Doe*, 63 F.3d at 128 (quoting *Press-Enterprise II*, 478 U.S. at 9). Fourth, if closure is warranted, the court must "devise a closure order that, while not necessarily the least restrictive means available to protect the endangered interest, is narrowly tailored to that purpose." *Doe*, 63 F.3d at 128 (internal citation omitted).

which the material poses danger to a defendant's right to a fair trial, and the extent to which it threatens individuals' privacy interests. It also requires differentiating between Title III material that has been judicially tested and not suppressed, and untested Title III material whose lawfulness has yet to be judicially determined.

With regard to untested Title III material like that at issue here, the interests that countervail the public's constitutional right of access are significantly stronger. Untested wiretap material may turn out to be inadmissible. *See In re Globe Newspaper Co.*, 729 F.2d 47, 54 (1st Cir. 1984) ("Until the Title III material has been tested at a suppression hearing, a court considering whether the material may be disclosed to the public should entertain the possibility that it was unlawfully obtained."). There is a heightened chance that the public disclosure of such material would prejudice the defendants' right to a fair trial and the defendants' and third parties' privacy interests. As the Supreme Court noted in *Gannett Co. v. DePasquale*, 443 U.S. 368 (1979), the pre-trial dissemination of "inadmissible prejudicial information about a defendant" may "jeopardize[]" the trial's fairness. *Id.* at 379; *United States v. Giordano*, 158 F. Supp. 2d 242, 247 (D. Conn. 2001) ("[B]ecause the information to which the public seeks access consists of legally untested Title III evidence that may be inadmissible and irrelevant at trial, and because there is a substantial likelihood that this evidence would be the subject of the inordinate, extensive and unwavering publicity that this case has and will undoubtedly continue to receive, there exists a real danger that premature publication of this evidence could make a fair trial impossible."). Moreover, disclosure may "compound[]" the "invasion of

privacy" of the defendants and others.[4] *Globe Newspaper*, 729 F.2d at 54. As one would expect, a number of courts have held that no constitutional right of access extends to suppressed Title III material. *See United States v. McVeigh*, 119 F.3d 806, 813 (10th Cir. 1997) (stating that "the right of access to suppression hearings and accompanying motions does not extend to the evidence actually ruled inadmissible in such a hearing" and collecting cases for that proposition); *cf. Gannett*, 443 U.S. at 378 ("The whole purpose of [suppression] hearings is to screen out unreliable or illegally obtained evidence and insure that this evidence does not become known to the jury."); *U.S. v. Gonzales*, 150 F.3d 1246, 1260 (10th Cir. 1998) (describing with approval a prior holding in the Tenth Circuit that "press access to suppressed evidence would play a negative role in the functioning of the criminal process by exposing the public and potential jurors in particular to incriminating evidence not to be introduced at trial"). If the disclosure of suppressed evidence is likely to prejudice important interests, the disclosure of potentially suppressable, but as yet untested, evidence may well do so too.

While the public disclosure of potentially suppressable Title III material could work particularly serious harm to defendants' fair trial rights and the privacy interests of defendants and third parties, the non-disclosure of untested Title III material, prior to a determination of its lawfulness on a suppression motion, would work comparatively mild harm to the public's First Amendment right of access. *See Globe Newspaper*, 729 F.2d at

---

[4] In this regard, the Second Circuit has emphasized that "the right of privacy protected by Title III is extremely important." *New York Times I*, 828 F.2d at 115. "[T]he privacy interests of innocent third parties as well as those of defendants that may be harmed by disclosure of the Title III material should weigh heavily in a court's balancing equation in determining what portions of motion papers in question should remain sealed or should be redacted." *Id.* at 116.

8

58 ("the harm in delayed access is not as great as that in denied access" to Title III material). Should Title III material be found to have been lawfully obtained, the public's claim of access to that material will be stronger. Put differently, while the First Amendment grants the public a presumption of access to unsuppressed Title III material, that presumption—assuming it exists at all—is a good deal weaker when untested Title III material is at issue.

Because the public's First Amendment right is weaker and countervailing interests stronger with regard to untested wiretap material, there is good reason to strike the balance of interests differently here. But the government's proposed procedure ignores the distinction between unsuppressed and untested Title III material.[5] In the cases on which the government relies, the district court considered only the extent of the public's right to access unsuppressed Title III material. *See Gerena*, 869 F.2d at 83; *New York Times I*, 828 F.2d at 112–13. In *Gerena*, which the government evidently uses as a model for its proposal, the Second Circuit said that, "when the government wants to use unsuppressed Title III materials in a publicly filed memorandum or brief, the government must give defendants notice and the opportunity to object." *Gerena*, 869 F2d at 86. According to the *Gerena* procedure, upon a defendant's objection to a document the court would weigh the interests at stake and decide whether and to what extent to seal it. The Second Circuit reasoned that, because "of the presumption of openness created by the

---

[5] It also bears noting that, as proposed, the government's procedure would apply to any Title III material submitted to the Court under any circumstances. This goes too far. Not all pretrial proceedings, and therefore not all documents submitted to a court in a criminal case, are necessarily subject to the First Amendment's strictures. Whether the public has a constitutional right to access a particular proceeding or document is a case-specific inquiry sourced in experience and logic. *See Press-Enterprise II*, 478 U.S. at 9.

9

qualified First Amendment right of access to papers filed in court, this [procedure] will properly place the burden on defendants of both objecting to the proposed briefs and memoranda and persuading the court that the Title III material contained in them should be continued under seal." *Id.* at 86.[6]

The procedure outlined in *Gerena*, however, holds limited relevance for the Court in deciding whether untested Title III material should remain sealed. Neither party in this case has cited a decision, and the Court is aware of none, in which defendants were required to make line-by-line objections to the government's proposed use of *untested* Title III material.

The Court believes that such a procedure does not adequately account for the prejudice that disclosure of untested Title III material could inflict on the defendants. As a very practical matter, if untested material is unsealed but then suppressed, it will likely be impossible to undo the damage done. This is not to say that untested wiretap material could *never* be subject to disclosure on First Amendment grounds—only that, because defendants' "privacy and fair trial interests" are "at their zenith" before the material has been tested, *Globe Newspaper*, 729 F.2d at 59, the scales at present tip more heavily in the direction of sealing. As a default measure, therefore, the parties should continue to redact all Title III material from their filings on defendants' proposed motions to suppress. Following such submissions, any party, or interested non-party, may petition

---

[6] Even when only unsuppressed Title III material is at issue, the Court has its doubts about the wisdom of placing the burden squarely on defendants to show that the material should be sealed—especially if this procedure is taken to imply that the First Amendment right of access is more important than defendants' Sixth Amendment right to a fair trial and their privacy rights. That implication would run counter to the Supreme Court's admonition that "[n]o right ranks higher than the right of the accused to a fair trial." *Press-Enterprise I*, 464 U.S. at 508.

the Court for material to be unsealed. Should such a motion be filed, the Court will examine the specific challenged redactions and weigh the competing interests, taking into account the desirability of deciding any motion to suppress prior to ruling on a motion to unseal.

* * *

Though the First Amendment grants the public and the media a right of access to even prejudicial Title III material, that right is far from absolute. Shielding such material from the public eye is often critical to protect defendants' fair trial and privacy interests, especially when the material has yet to be tested in court. *See Globe Newspaper*, 729 F.2d at 58 ("The privacy interest that attends the Title III material cannot be protected by any method other than preventing the material's disclosure to the public, since disclosure itself is the injury to be avoided."). The government's proposed procedure does not address the special concerns that untested wiretap material raises. Accordingly, its motion [62] is denied.

SO ORDERED.

Dated: New York, New York
April 27, 2010

*[signature]*

Richard J. Holwell
United States District Judge