UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

UNITED STATES OF AMERICA

   -v.-

DANIELLE CHIESI,

               Defendant.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

S1 09 CR 1184 (RJH)

## GOVERNMENT'S SENTENCING MEMORANDUM

 

PREET BHARARA
United States Attorney
Southern District of New York
Attorney for the United States
      of America

JONATHAN R. STREETER
REED M. BRODSKY
Assistant United States Attorneys
ANDREW Z. MICHAELSON
Special Assistant U.S. Attorney

   - Of Counsel -

# **TABLE OF CONTENTS**

I.   Preliminary Statement .................................................... 1

II.  The Insider Trading Schemes ............................................. 2

III. Consideration of 3553(a) Factors ........................................ 8

   A.  Nature and Circumstances of the Offense /
       Characteristics of the Defendant ................................... 8

   B.  The Need to Afford Adequate Deterrence ............................ 10

   C.  The Need to Avoid Unwarranted Sentence Disparity .................. 11

IV.  Conclusion ............................................................ 14

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x
                              :
UNITED STATES OF AMERICA      :
                              :
    -v.-                      :
                              :   S1 09 CR 1184 (RJH)
DANIELLE CHIESI,              :
                              :
            Defendant.        :
                              :
                              :
------------------------------x

## GOVERNMENT'S SENTENCING MEMORANDUM

The Government respectfully submits this memorandum for the Court's consideration in connection with the sentencing of the defendant Danielle Chiesi. For the reasons stated herein, the Government submits that a sentence within the Sentencing Guidelines range of 37-46 months is appropriate.

### I.   PRELIMINARY STATEMENT

In 2008, Danielle Chiesi worked at a major Wall Street hedge fund as an experienced technology analyst and portfolio manager. A veteran with over 20 years of experience in the financial services industry, she counted among her professional contacts some of the most powerful people in that industry – people who controlled billions of dollars – as well as countless senior business executives. She was a consummate Wall Street insider.

Chiesi abused her privileged position by engaging in insider trading schemes of broad dimensions. Chiesi obtained material, nonpublic information from Robert Moffat, one of the most senior executives at International Business Machines Corp. ("IBM"), about not only IBM

but also IBM's business partners. In addition, she obtained inside information from Hector Ruiz, the Chairman of Advanced Micro Devices, Inc. ("AMD"). Chiesi traded on this information in her hedge fund's accounts. She shared it with her supervisor, Mark Kurland, so that their $1 billion-hedge fund could take even larger positions in the stocks than Chiesi was authorized to take on her own. She also shared the inside information with portfolio managers like Raj Rajaratnam, Steven Fortuna, Richard Choo-Beng ("C.B") Lee, Ali Far and others – people who controlled billions more dollars – in part in exchange for other inside information. Further, Chiesi took numerous steps to conceal her extensive criminal conduct and was caught only after the Government obtained Court authorization to wiretap Rajaratnam's cellphone, and later her own phones.

While insider trading is always a serious crime, Chiesi's conduct was particularly so. First, Chiesi's schemes involved some of the most powerful and connected members of the business and financial industries, whose collective misconduct has, given the stature of the players, caused particularly acute harm to investor confidence in the markets that the securities laws are designed to protect. Second, Chiesi's sophisticated schemes were difficult to detect, and she took active steps to ensure that she would never be caught. Third, and finally, Chiesi played a critical role in each of her criminal schemes, and with respect to some, such as obtaining information from Robert Moffat, she initiated the criminal conduct.

For these and all of the reasons stated herein, the Government respectfully submits that a sentence within the applicable Sentencing Guidelines range is clearly warranted.

## II. THE INSIDER TRADING SCHEMES

During the relevant time period, Danielle Chiesi worked at New Castle Partners ("New

Castle"), a $1 billion-hedge fund affiliated with JPMorgan Chase & Co., and formerly with Bear Stearns Asset Management ("BSAM"). Chiesi started working in the financial services industry in or around 1987, and had joined New Castle around the time of its inception in 1995. By 2008, Chiesi was both a senior technology analyst for New Castle and a portfolio manager, with trading authority to buy or sell stocks across New Castle's family of funds. She reported directly to Mark Kurland, the co-head of New Castle and one of its original founders. From this perch, Chiesi participated in multiple insider trading schemes, each involving individuals operating at the highest echelons of business and finance.

  Chiesi herself initiated the conspiracy to obtain inside information from Robert Moffat. In 2008, Moffat served as a Senior Vice President and Group Executive at IBM, with responsibility for IBM's Systems and Technology Group. Moffat reported directly to IBM's CEO, Sam Palmisano; he routinely attended meetings at which sensitive, confidential information regarding IBM's financial performance was discussed; and he was personally involved in, if not leading, many of IBM's most secret business deals and negotiations. Chiesi and Moffat were friends. They were having an affair. And in the course of their relationship, Chiesi asked Moffat for sensitive, confidential information about IBM's financial performance and business activities. Moffat disclosed inside information to Chiesi, knowing that Chiesi worked at a hedge fund, for the purpose of helping her at her job. And Chiesi fully understood that Moffat's disclosures constituted violations of his duties owed to IBM. Chiesi engaged in similar conduct with Hector Ruiz – the Chairman of AMD – whom she contacted frequently to obtain inside information about AMD.

  Chiesi traded securities on the basis of inside information she obtained in accounts

affiliated with New Castle. In addition, she shared this inside information with her supervisor, Mark Kurland, with whom she engaged in a separate conspiracy to commit insider trading. A hedge fund employee's compensation is based, in part, on his or her contribution to the fund's performance. Chiesi contributed to New Castle's performance by placing trades directly, but her trading authority was limited to taking relatively small positions. Chiesi could not direct New Castle to take a substantial position in any one stock. To take such a position, Chiesi needed to obtain Kurland's approval. So Chiesi routinely provided inside information she obtained to Kurland, and encouraged Kurland to take significant positions based on the inside information.

Another of Chiesi's insider trading schemes involved hedge fund managers who worked at funds other than New Castle. One of these managers was Raj Rajaratnam, the head of the Galleon Group family of hedge funds that had, at its peak, approximately $7 billion in assets under management. In furtherance of this scheme, Chiesi used inside information she obtained from her sources as a bargaining chip to obtain additional tips and information, including inside information, from Rajaratnam. Chiesi then traded on this inside information in New Castle accounts and shared that information with Kurland.

Similarly, Chiesi shared her inside information with numerous other hedge fund managers, including Steven Fortuna (a co-head of S2 Capital), Ali Far and C.B. Lee (the co-heads of Spherix Capital), and other hedge fund managers. Those hedge fund managers in turn traded on that information. Fortuna, Far and Lee have all themselves pled guilty to insider trading schemes, are cooperating with the Government, and have not yet been sentenced.

**AMD.** Chiesi committed acts in furtherance of these schemes in relation to an announcement by AMD on October 7, 2008, of a significant corporate restructuring involving

investors based in Abu Dhabi. On August 15, 2008, Rajaratnam called Chiesi to ask what she was hearing with respect to AMD. Rajaratnam told her that "yesterday we had ummm shake hands." Chiesi told Rajaratnam that she would be meeting with Moffat two days later. Rajaratnam told her that he "got a call from my guy last night," and that the investors would be putting in "six to eight billion dollars." Later in the call, Rajaratnam asked Chiesi "if you can find out whether IBM is also giving their technology." (AMD needed to obtain a certain license from IBM in order for the deal to happen, and Moffat was involved in IBM's negotiations with AMD over the license.) Chiesi informed Rajaratnam that "IBM will give them their, their technology, yes." Rajaratnam instructed Chiesi to keep the information "radio silence," and Chiesi replied, "Oh please. That is my pleasure." That very day, New Castle began to acquire AMD stock.

Indeed, during the months leading up to the public announcement of AMD's reorganization, Chiesi obtained confidential information about the AMD deal from both Moffat and AMD's Chairman Ruiz. Chiesi disclosed this inside information to Kurland, and she pushed Kurland to acquire more AMD stock on the basis of the inside information, which Kurland did. In August and September 2008, New Castle acquired millions of shares of AMD stock worth tens of millions of dollars.

In addition, Chiesi continued to conspire with Rajaratnam. Chiesi shared with Rajaratnam the inside information she obtained, and in exchange Rajaratnam provided her with inside information he obtained from Anil Kumar, a senior consultant with McKinsey & Co. who performed work for AMD. On August 27, 2008, Chiesi expressed concern that AMD stock could be "up 30 percent" when the deal is announced. She asked Rajaratnam, "Do you think that

5

I should show a pattern of trading AMD?" Rajaratnam replied, "I think you should buy and sell, and buy and sell." Chiesi later said that she was not trading options (which are considered in the industry to be a red flag to regulators), and Rajaratnam instructed her to "be radio silent."

On September 30, 2008, Rajaratnam told Chiesi, "The date is October 7th." Chiesi asked, "Do you think in this environment – I know everybody's being investigated – do you think I could buy it here, honestly? And I'm glad that we talk on a secure line. I appreciate that." Rajaratnam instructed her, "If you want to buy 500 [thousand shares], I would buy a million and sell on Friday 500,000, you know?" Rajaratnam also told Chiesi that the investors in AMD are "Mubadala," and that "they're gonna say on the press release that they're committing to putting $5-6 billion over the next several years." On the day of that call, New Castle purchased another 127,600 shares of AMD stock. Later that day, following the close of the market, Chiesi and Rajaratnam spoke again about AMD. Rajaratnam said, "It's been widely speculated. What people don't know is the time." In other words, ordinary investors did not know when the long-rumored deal would actually be announced. But Rajaratnam and Chiesi – based on their inside sources – did.

On October 7, 2008, AMD announced the deal before the market opened. AMD stock opened for trading up approximately 25 percent over the previous day's close. New Castle, however, did not realize a profit from its trading in AMD stock during this time period, in part due to the financial crisis that precipitated a broad decline in stock markets.

**IBM.** On January 20, 2009, IBM announced its quarterly earnings. Earnings for the fiscal quarter that ended in December 2008 were $3.28 per share, exceeding analysts' expectations of approximately $3.03. With respect to guidance, IBM announced that it expected

6

earnings per share for 2009 of at least $9.20, which also exceeded expectations. The next day, IBM stock opened up approximately five percent. Well before the announcement, Moffat provided Chiesi with confidential information regarding IBM's performance. The next day, New Castle switched its position on IBM stock, covering a short position and buying additional shares. On January 20, 2009 – the day of the announcement – New Castle purchased an additional 45,200 shares of IBM stock. On that same day, Chiesi provided the inside information regarding IBM to C.B. Lee. Following the positive announcement, New Castle sold its shares of IBM, realizing a profit of approximately $700,000.

**Sun.** Also in January 2009, Chiesi conspired with each of Moffat and Kurland to engage in insider trading in the securities of Sun Microsystems, Inc. ("Sun"). In December 2008, IBM and Sun entered into a confidentiality agreement in connection with discussions of a potential business acquisition. In January 2009, IBM began to conduct due diligence on Sun in anticipation of placing a bid to acquire it. Moffat was involved in both IBM's negotiations with, and its due diligence on, Sun. On Thursday, January 22, 2009, pursuant to the confidentiality agreement in place between Sun and IBM, Sun provided IBM with a draft of its quarterly earnings to be released to the public the following week. Moffat received this information and provided it to Chiesi. On Monday, January 26, 2009, New Castle purchased approximately 283,600 shares of Sun stock at a price of $3.80 per share. In addition, Chiesi again provided the information to C.B. Lee. On January 27, 2009, New Castle purchased an additional 784,900 shares at prices ranging from $3.97 to $4.28 per share. Later that day, following the close of the market, Sun announced quarterly earnings that exceeded market expectations. Sun's stock price traded up approximately eight percent following the announcement. Between January 28, 2009

7

and February 9, 2009, New Castle sold approximately 949,900 shares of Sun stock, realizing a profit of approximately $900,000.

### III. CONSIDERATION OF 3553(a) FACTORS

In determining a reasonable sentence, the sentencing judge is required to consider the factors set forth at 18 U.S.C. § 3553(a). These factors include, among others, the nature and circumstances of the offense and the history and characteristics of the defendant; the need for the sentence to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment; the need to afford adequate deterrence to criminal conduct; and the need to avoid unwarranted sentence disparity. This memorandum addresses three factors of particular significance in this case: (a) the nature and circumstances of the offense and characteristics of the defendant, (b) the need to afford adequate deterrence, and (c) the need to avoid unwarranted sentence disparity.

### A. Nature and Circumstances of the Offense / Characteristics of the Defendant

Chiesi's criminal schemes were broad and far-reaching. She and her conspirators obtained inside information from extraordinarily well-placed sources like Robert Moffat and Anil Kumar, who by virtue of their high rank and records of accomplishment were privy to a great deal of sensitive of inside information. Thus, for example, Moffat had access to sensitive information about not only IBM's financial performance, but also its negotiations with each of AMD and Sun. And given his position, this information was highly reliable and therefore highly valuable to insider traders such as Chiesi and her co-conspirators. Moffat had access to all of this inside information because he was thought to be trusted, and Chiesi's criminal conduct was premised on the breach of that special trust. This renders Chiesi's criminal conduct of the most

8

serious in nature, for it attacked the very core of the trust on which our market's business leaders (and shareholders) must rely.

Chiesi's crimes are also significant because of the stature of the money managers with whom she conspired. Kurland (formerly the chairman and chief executive of BSAM) and Rajaratnam (formerly the President of Needham & Co.), were leading members of the financial community, and they controlled billions of dollars. Fortuna, Far, Lee and others to whom Chiesi provided inside information were also themselves the managers of significant hedge funds. Thus, for example, when AMD announced its corporate reorganization, Rajaratnam's Galleon funds owned approximately 25 million shares of AMD (valued at approximately $100 million dollars). New Castle owned millions more. Purchases of this magnitude have a dramatic effect on stock prices. Moreover, they create more victims (in the sense that there are more individuals taking the other sides of these trades, acting without the benefit of the inside information). And perhaps more importantly, insider trading by well-connected money managers damages the public's trust in the integrity of the markets. Insider trading at this level fuels suspicions that the market is simply not fair.

Insider trading constitutes a violation of the Securities and Exchange Act of 1934, and a fundamental purpose of that statute is to ensure fair dealing and outlaw deceptive and inequitable practices in the securities markets. Congress recognized that any deceptive or manipulative practice that influenced or related to trading activity undermined the function and purpose of a free market. Insider trading causes that harm – namely by undermining the public's confidence in the capital markets, and by suggesting to ordinary investors that they should not invest because those markets are rigged in favor of well-connected Wall Street professionals like Chiesi,

Rajaratnam, Kurland and others.

Finally, Chiesi's crimes are significant because of the sophisticated methods that she used to evade detection. Chiesi did not leave a trail of documentary evidence of her crime. She did not trade options. And she discussed with Rajaratnam how to show a pattern of trading – buying stock on the basis of inside information and then selling a bit to create a smoke screen around that insider trading. These techniques were all calculated to thwart traditional investigations into insider trading. Chiesi was caught only because in March 2008 the Government obtained authorization pursuant to Title III to intercept wire communications occurring over Rajaratnam's cellphone, and it thereafter obtained similar authorization to wiretap Chiesi's phones. The Government then intercepted Chiesi engaging in insider trading, and it also intercepted her describing to others the array of techniques she employed to avoid getting caught.

At the time of the crimes, Chiesi was a seasoned investment professional. She worked with – and conspired with – some of the most powerful investors on Wall Street. In furtherance of her criminal conspiracies with these money managers, she obtained inside information from some of the highest level executives in the United States. This is not garden-variety insider trading. That fact should be reflected in her sentence.

### B.     The Need to Afford Adequate Deterrence

It is particularly important that sentences serve to deter crimes, like insider trading, that are difficult to detect. *See United States v. Heffernan*, 43 F.3d 1144, 1149 (7th Cir. 1994) (Posner, J.) ("Considerations of (general) deterrence argue for punishing more heavily those offenses that either are lucrative or are difficult to detect and punish, since both attributes go to increase the expedited benefits of a crime and hence the punishment required to deter it.").

Insider trading is difficult to detect in general, but Chiesi went to great lengths to make her schemes even *more* difficult to detect. The Government ultimately caught up to her, but only by itself going to great lengths. Accordingly, the Government submits that a sentence below the applicable guidelines range will not provide adequate deterrence. *See United States v. Naseem*, 07 Cr. 610 (S.D.N.Y. May 30, 2008) (Patterson, J.) ("There I feel we're talking about deterring other people. I'm not sure the guideline offense is great enough. This kind of conduct has been prosecuted before and it doesn't seem to deter people very much. So that is a strong reason to adhere to the guideline calculation.... I think my conclusion is that this crime has to be deterred, it is has to be deterred by a stiff sentence.").

In addition, as previously discussed, Chiesi's schemes caused harm that was particularly acute given the seniority and high ranks of her various co-conspirators. For this reason, too, a sentence below the guidelines would not provide adequate deterrence.

### C.   The Need to Avoid Unwarranted Sentence Disparity

Defendants in this district who have engaged in insider trades schemes of scale and sophistication on par with Chiesi's have, and in the Government's view should, receive sentences within the applicable Sentencing Guidelines range.

For example, the Honorable Deborah A. Batts recently sentenced two individuals in connection with a sophisticated insider trading ring involving Wall Street professionals at UBS. In *United States v. Guttenberg*, 07 Cr. 141 (DAB), Mitchel Guttenberg, a former institutional client manager in the equity research department at UBS, disclosed inside information to David Tavdy, a trader, about analyst upgrades and downgrades. Tavdy used the information to execute hundreds of securities transactions, earning approximately $10 million in illegal profits. On

11

November 3, 2008 and February 24, 2009, the Honorable Deborah A. Batts sentenced Guttenberg (the tipper) to 78 months' imprisonment, and Tavdy (the tippee) to 63 months' imprisonment, respectively. Both sentences were within the applicable guidelines ranges.

In addition, two individuals who participated in Chiesi's schemes have already been sentenced, and each has received a sentence either within or just below the applicable guidelines ranges. First, on May 22, 2010, the Honorable Victor Marrero sentenced Mark Kurland to 27 months' imprisonment, just barely below the applicable guidelines range (30-36 months). Second, on September 13, 2010, the Honorable Deborah A. Batts sentenced Robert Moffat to 6 months' imprisonment, at the high end of the applicable guidelines range (0-6 months).[1] Accordingly, a sentence within the applicable guidelines range here would be generally consistent with sentences imposed in the related cases, as well as in recent cases in this district involving similarly sophisticated schemes.

Indeed, it is a sentence *below* the applicable guidelines range that would raise the specter of unwarranted sentence disparity. Chiesi is simply more culpable than Kurland, since she was the one on the front lines obtaining inside information and swapping it with others. It was Chiesi, and not Kurland, who had the relationship with Moffat. It was Chiesi, and not Kurland, who induced Moffat to breach his duties to IBM. And it was Chiesi, and not Kurland, who magnified the crime by simultaneously conspiring with Rajaratnam and others, who controlled billions of more dollars.

---

[1] On November 8, 2010, Your Honor sentenced Ali Hariri to 18 months' imprisonment, which was below the applicable guidelines range (24 to 30 months). Hariri's scheme, however, did not directly relate to Chiesi's, and for the reasons set forth above, Chiesi's offenses are far more serious in nature.

Indeed, Chiesi's role was sufficiently central to her scheme with Kurland that Kurland argued at his sentencing that he should be entitled to a two-level minor role adjustment pursuant to Section 3B1.2. The Government (and Judge Marrero) disagreed with that argument, since Kurland did in fact play an active role in the scheme under the appropriate legal standard. But the fact that Kurland played an active role in the conspiracy (and that he supervised Chiesi at New Castle), does not mean that Kurland drove it. Chiesi was a primary actor in her scheme not only with Kurland, but with others such as Rajaratnam and Moffat. Chiesi operated largely on her own, and she was sufficiently experienced and sophisticated that she knew precisely what she was doing. In short, she was not merely Kurland's minion.

Considering her role in the schemes, a sentence for Chiesi within the applicable guidelines range would be entirely consistent with that of Kurland, which was only slightly lower (by 3 months) than his applicable guidelines range.[2] It would also be consistent with that of Moffat, who received a sentence at the high end of his applicable guidelines range.

---

[2] Chiesi's guidelines range (37-46 months) is higher than the range that was applicable to Kurland (30-36 months) since Chiesi's offense conduct includes the profit realized from insider trading relating to IBM's earnings announcement in January 2009, and Kurland's offense conduct did not.

13

IV.  **CONCLUSION**

For the foregoing reasons, the Government respectfully submits that a sentence within the Guidelines sentencing range of 37-46 months is appropriate.

Dated:  New York, New York
        June 13, 2011

Respectfully submitted,

PREET BHARARA
United States Attorney
Southern District of New York

By: _____
Jonathan R. Streeter
Reed M. Brodsky
Assistant United States Attorneys
Andrew Z. Michaelson
Special Assistant United States Attorney
(212) 637-2272/2492/2348

14